UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
CAT3, LLC, a New Jersey limited    :    14 Civ. 5511 (AT) (JCF)
liability company, SXH, a New      :
Jersey limited liability company,  :        MEMORANDUM
and SUCHMAN, LLC, a New Jersey      :        AND  ORDER
limited liability company,         :
                                   :
                Plaintiffs,        :
                                   :
      - against -                  :
                                   :
BLACK LINEAGE, INC., a California   :
Corporation, and VAHE ESTEPANIAN   :
a/k/a FLETCH ESTEPANIAN,           :
                                   :
                Defendants.        :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

        The sanctions motion now pending in this case raises

significant issues concerning the reach of newly amended Rule 37(e)

of the Federal Rules of Civil Procedure, the standard of proof

governing spoliation, and the relief appropriate for destruction of

electronically stored information ("ESI").  The complaint alleges

trademark infringement, false designation of origin, unfair

competition, and cybersquatting under the Lanham Trademark Act of

1946 ("the Lanham Act"), 15 U.S.C. §§ 1114(1), 1125(a), and

1125(d), as well as claims under New York law.  The plaintiffs --

Cat3, LLC and Suchman, LLC -- assert rights in the trademark

"SLAMXHYPE" and the domain name www.SLAMXHYPE.com, which they use

in connection with the sale of clothing and the operation of a

website and online magazine.  They contend that the use of the trademark FLASHXHYPE and the domain name www.FLASHXHYPE.com by the defendants -- Black Lineage, Inc. and Vahe Estepanian -- interferes with their trademark rights.

The defendants contend that the plaintiffs altered certain emails relevant to the claims in this case before producing them in response to discovery demands.  Accordingly, the defendants move under Rules 26 and 37 of the Federal Rules of Civil Procedure as well as pursuant to the Court's inherent authority for sanctions consisting of some combination of dismissal of the complaint, imposition of an adverse inference, an order of preclusion, and assessment of attorneys' fees and costs.  For the reasons that follow, the motion is granted in part and denied in part.

<u>Background</u>

One of the key issues in this case is whether the defendants developed their FLASHXHYPE mark independently or, instead, sought to trade on the plaintiffs' reputation after learning of their use of the SLAMXHYPE mark.  Therefore, <u>when</u> the defendants first became aware of the SLAMXHYPE designation is critical.  According to the Second Amended Complaint, "employees of Marc Ecko Enterprises and/or The Collective [(predecessors to Cat3)] specifically made Defendant Estepanian aware that Plaintiffs had acquired the rights in and to the trademark[] [] SLAMXHYPE . . . . prior to the date

that Defendants acquired the www.FLASHHYPE domain name and/or otherwise adopted the trademark FLASHXHYPE." (Second Amended Complaint ("SAC"), ¶ 35). Similarly, the plaintiffs contend that "after one or more employees of Plaintiffs . . . had disclosed to Defendant Estepanian Plaintiffs' plans to rebrand their business as SLAMXHYPE, Defendant Black Lineage registered the domain name www.FLASHXHYPE.com." (SAC, ¶ 37).

The defendants produced relevant email correspondence in discovery on February 18, 2015, and the plaintiffs made their initial email production the following day. (Declaration of Richard H. Zaitlen dated Sept. 16, 2015 ("Zaitlen Decl."), ¶ 3 & Exh. A). Apparently, the email correspondence was produced in discovery in PDF form. (Zaitlen Decl., Exh. A).

On April 8 and 9, 2015, plaintiffs' counsel took the deposition of Black Lineage's president, defendant Vahe Estepanian. Plaintiffs' counsel showed the witness a document, marked as Exhibit 10, which appeared to be an email sent by Kris Nalbandian, a Black Lineage employee, on July 17, 2013. (Memorandum of Law in Support of Defendants' Motion for Sanctions at 2-3; Declaration of Michael Kunkel dated Sept. 16, 2015 ("Kunkel Decl."), Exh. D). It was addressed to Mr. Estepanian at the email address fletch@blacklineage.com and to one of plaintiffs' employees, Jeremiah Myers, at the email address jeremiah@slamxhype.com.

(Kunkel Decl., Exh. D).  Other of the defendants' employees were also listed as recipients, but their email addresses all contained the domain name "thecollective.com."  On direct examination, Mr. Estepanian acknowledged that he was copied on Exhibit 10 and that it showed Mr. Myers's email address to be jeremiah@slamxhype.com. (Deposition of Vahe Estepanian dated April 8, 2015, excerpts attached as Exh. B to Zaitlen Decl., at 201).  On cross-examination, however, it became apparent that there was more than one version of the document marked as Exhibit 10.  Mr. Estepanian testified that the email he had received, a copy of which the defendants produced in discovery, was identical to Exhibit 10 except that the domain name for Jeremiah Myers's email address appeared as @ecko.com.  (Deposition of Vahe Estepanian dated April 9, 2015, excerpts attached as Exh. C to Zaitlen Decl., at 158-60, 163-66).

Defendants' counsel then sought to explore the discrepancy, and as early as May 21, 2015, they demanded production of the plaintiffs' emails in native form.  (Email of Kelly W. Craven dated May 21, 2015, attached as Exh. D to Zaitlin Decl.).  The plaintiffs did not initially respond (Letter of Richard Zaitlen dated July 10, 2015, at 4), their attorneys withdrew and were replaced by new counsel (Letter of Gregg Donnenfeld dated July 20, 2015), and, on July 30, 2015, I ordered the plaintiffs to comply with the

4

defendants' request (Order dated July 30, 2015).  Thereafter the
plaintiffs produced a USB drive containing a PST file, a zip file,
and several separate PDFs of relevant emails.  (Kunkel Decl., ¶ 6;
Tr. at 3[1]).

The defendants subjected that production to a forensic
analysis by Michael Kunkel, Director of Investigative Services for
Setec Investigations.  (Kunkel Decl., ¶¶ 1, 6).  Mr. Kunkel
determined that

> Plaintiffs' email production revealed that each email
> message appeared in two versions within the production.
> The "top" level version of each email shows the message
> in full, as well as sender and recipient information and
> the date and time each message was sent/received.
>
> However, behind each email message is a near-duplicate
> copy of the message containing the identical message,
> with the identical date and time.  The only pieces of
> information that are altered from the top version of the
> email message to the near-duplicate version beneath are
> the certain email domains that appear for a number of the
> senders and recipients of the emails.

(Kunkel Decl., ¶¶ 7-8).  The underlying near-duplicate versions
were the original emails, which had been deleted, albeit not
without leaving a digital imprint.  (Kunkel Decl., ¶¶ 10-11; Tr. at
3-4).  According to Mr. Kunkel,

> this anomaly is the result of Plaintiffs having initially
> copied the version of the emails that contained the true
> and correct email addresses/domain names, and then

---

[1] "Tr." refers to the transcript of an evidentiary hearing
held on December 1, 2015.

deleting the true and correct versions prior to production. The deleted emails were then replaced with a second, altered version of the email correspondence, which was then produced to Defendants.

(Kunkel Decl., ¶ 10).

Mr. Kunkel gives as one example an email from Jeremiah Myers dated July 17, 2013 at 2:15 PDT with the subject line "Re: Arsnl Deposits Payout Request." (Kunkel Decl., ¶ 9). In the underlying original email, the address appearing in the "From" field is jeremiahm@ecko.com, and the addresses in the "CC" field each contain an @ecko.com domain suffix. (Kunkel Decl., ¶ 9 & Exh. C). By contrast, in the "top" version of the email, the email addresses in both the "From" and "CC" fields have been replaced by technical strings of code. (Kunkel Decl., ¶ 9 & Exh. B). Mr. Kunkel goes on to identify discrepancies between the address information in several emails produced to the defendants and that discovered in the underlying original communications. In the email from Kris Nalbandian dated July 17, 2013 at 12:54 p.m., which was produced by the plaintiffs to the defendants and shown to Mr. Estepanian at his deposition, the "To" field includes jeremiah@slamxhype.com and several of the plaintiffs' employees with domain suffixes of @thecollective.com. (Kunkel Decl., ¶ 11 & Exh. D; Tr. at 5). The recovered deleted version of this email, however, is addressed to jeremiahm@ecko.com and other employees at @ecko.com. (Kunkel

Decl., ¶ 11 & Exh. E; Tr. at 5).   There are similar discrepancies between the original version and the version provided to the defendants of each of the six emails that Mr. Kunkel received as isolated emails in PDF form.   (Kunkel Decl., ¶ 12 & Exhs. F-K (versions produced to defendants as PDFs), L-Q (deleted versions)). In each of these emails, whether in the "To," "From," or "CC" field, the domain suffix for Mr. Myers was altered from @ecko.com to @slamxhype.com, while the suffix for other of the plaintiffs' employees was changed from @ecko.com to @thecollective.com.   Mr. Kunkel is unaware of any reason that the produced email would show a different domain for a sender or recipient unless it was altered, and he concluded that "the presence of the deleted emails is the result of intentional human action, and not of an automatic or inadvertent computer process."   (Kunkel Decl., ¶ 13).

The defendants then moved for sanctions, relying largely on Mr. Kunkel's analysis.

The plaintiffs responded, submitting affidavits from three individuals.   Seth Gerszberg, the plaintiffs' chief operating officer, averred that he did not materially alter any of the documents or files at issue and had no knowledge of anyone else doing so.   (Declaration of Seth Gerszberg dated Oct. 14, 2015, ¶ 4).   Similarly, the plaintiffs' general counsel, Gregg Donnenfeld, denied being aware of any such alteration.   (Declaration of Gregg

Donnenfeld dated Oct. 14, 2015, at ¶ 3).   Finally, Shaun S. Martinez, the plaintiffs' director of information technology, not only denied knowledge of any manipulation of the documents, but also asserted that "[n]obody would have doctored, falsified or materially altered any of these documents or files without my knowledge or approval as I am the primary gatekeeper of all systems." (Declaration of Shaun S. Martinez dated Oct. 14, 2015 ("Martinez Decl."), ¶ 7).   Mr. Martinez also provided some information about the plaintiffs' email system.   Prior to January 2013, they used a Lotus Notes platform.   (Martinez Decl., ¶ 4). Then, in January 2013, they hired an outside vendor to migrate their email to an external Gmail cloud-based storage system, which they used until December 2013. (Martinez Decl., ¶¶ 4-5).   Finally, from January 2014 until the present, the plaintiffs have used Microsoft Office 365.   (Martinez Decl., ¶ 4).   According to Mr. Martinez,

> For the transition from the Gmail email service to Microsoft Office 365, various software tools were employed, including software provided by Microsoft and other third parties, to create new Microsoft Office profiles to receive mailbox data being migrated from the associated Gmail email accounts, and to modify domain name system (DNS) settings for the various email address domain names that Plaintiffs have used, including @thecollective.com, @slamxhype.com, and @ecko.com, to facilitate the transfer and delivery of email to the new software platform.

(Martinez Decl., ¶ 6).

8

Mr. Martinez was also designated as the plaintiffs' witness pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure to provide deposition testimony as to the creation, maintenance, and operation of the plaintiffs' email accounts.  (Deposition of Shaun S. Martinez dated Aug. 20, 2015 ("Martinez Dep."), attached as Exh. C to Declaration of Nicholas R. Lewis dated Oct. 14, 2015 ("Lewis Decl."), at 12-13).  When shown an email that was produced by the plaintiffs, the version of the same email produced by the defendants, and the version "recovered" by Mr. Kunkel, Mr. Martinez could not explain the differences in the address domain suffixes. (Martinez Dep. at 31-40).  He was aware that Mr. Myers utilized different email addresses, including @thecollective and @slamxhype (Martinez Dep. at 21), but he did not know when Mr. Myers began using any particular address or under what circumstances he would utilize one or another (Martinez Dep. at 46).

An evidentiary hearing was held on December 1, 2015, to fully develop the record.  Mr. Kunkel testified consistently with his declaration.  He reiterated that the deletion of emails with the @ecko.com domain suffix and the substitution of emails containing an @slamxhype suffix could not have occurred accidentally.  (Tr. at 5).  Further, in response to questions suggesting that such an anomaly might have resulted from the migration of the plaintiffs' emails from one system to another, he testified that such an

explanation would not be consistent with two versions of the same email remaining on the server.   (Tr. at 9-12).   Nor would two versions remain if an individual who utilized multiple user names set one of them as the automatic default.   (Tr. at 14-15).

Mr. Martinez also testified at the hearing, again denying that he had altered the emails and stating that he would have been aware of any such manipulation by others.   (Tr. at 16-17).   He acknowledged that, when the plaintiffs changed email providers, he did not anticipate that doing so would cause email addresses to be altered.   (Tr. at 18).   He also reaffirmed that he could offer no explanation for the changes that had occurred other than that the files had been deleted and replaced.   (Tr. at 20).

In addition, the plaintiffs proffered an expert witness for the first time at the hearing: Paul Hilbert, a principal of a company called Network Doctor.[2]   (Tr. at 22).   Mr. Hilbert offered two possible explanations for the existence of different versions

---

[2] The defendants objected to Mr. Hilbert's testimony on the ground that he had not been timely identified and they had therefore not had an opportunity to take his deposition.   I reserved decision and now overrule the objection.   Although the last-minute identification of this witness smacks of sharp practice, the defendants were fully able to cross-examine him at the hearing and ultimately suffered no prejudice.   See Softel, Inc. v. Dragon Medical and Scientific Communications, Inc., 118 F.3d 955, 961 (2d Cir. 1997) (identifying prejudice as factor in considering preclusion of witness); In re Fosamax Products Liability Litigation, 647 F. Supp. 2d 265, 280-81 (S.D.N.Y. 2009) (preclusion denied where prejudice mitigated).

of the same email containing different addresses. First, he suggested that the system can be set up such that the server automatically substitutes a particular address when the email is routed from the client through the server. (Tr. at 23). He also testified that it could occur when email is migrated from one system to a different type of system (Tr. at 24-25), though he conceded that this phenomenon is uncommon (Tr. at 28). Mr. Hilbert concluded that he could not exclude the possibility that the near-duplicate emails here resulted from an email migration or other underlying process. (Tr. at 26).

<u>Discussion</u>

A. <u>Applicable Version of the Rules</u>

The amendments to the Federal Rules that became effective on December 1, 2015 mandate substantial changes in civil practice, some of the most significant of which relate to spoliation sanctions under Rule 37(e). Previously, the rule consisted entirely of a modest safe harbor provision that protected against the imposition of sanctions where ESI was lost as the result of routine computer functions such as automatic deletion.[3] The

---

[3] The prior version of the rule stated in full: "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as the result of the routine, good faith operation of an electronic information system." <u>See</u> Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

amended rule is much more comprehensive.[4]   It was adopted to address concerns that parties were incurring burden and expense as a result of overpreserving data, which they did because they feared severe spoliation sanctions, especially since federal circuits had developed varying standards for penalizing the loss of evidence. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. While some circuits had required a showing of willfulness or bad faith before a court could dismiss a case, enter judgment by default, or utilize an adverse inference, the Second Circuit

---

[4] Amended Rule 37(e) reads as follows:

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

    (A) presume that the lost information was unfavorable to the party;

    (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

    (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P 37(e).

permitted such sanctions upon a finding that the party that had lost or destroyed evidence had acted negligently.  <u>Residential Funding Corp. v. DeGeorge Capital Corp.</u>, 306 F.3d 99, 108 (2d Cir. 2002).  The Rules Advisory Committee explicitly rejected the <u>Residential Funding</u> standard, Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment, and instead adopted the principle that severe sanctions are only permitted where the court finds an "intent to deprive another party of the information's use in the litigation," Fed. R. Civ. P. 37(e)(2).

In transmitting the proposed rules amendments to Congress on April 29, 2015, Chief Justice John G. Roberts included an order providing in part that "the foregoing amendments to the Federal Rules of Civil Procedure shall take effect on December 1, 2015, and shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending."  2015 US Order 0017.  This order is consistent with the relevant statutory provision, which states in part:

> The Supreme Court may fix the extent to which such rule [of procedure or evidence] shall apply to proceedings then pending, except that the Supreme Court shall not require the application of such rule to further proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies.

28 U.S.C. § 2074(a).  The issue, here, then, is whether to apply

the new version of Rule 37(e).

The new rule places no greater substantive obligation on the party preserving ESI. Rather, "Rule 37(e) does not purport to create a duty to preserve. The new rule takes the duty as it is established by case law, which uniformly holds that a duty to preserve information arises when litigation is reasonably anticipated." Report of Advisory Committee on Civil Rules, App. B-15 (Sept. 2014), available at http://www.uscourts.gov/uscourts/RulesandPolicies/rules/Reports/ST09-2014.pdf. This suggests that, since the amendment does not establish a new rule of conduct, either version of the rule could apply.

However, both the Supreme Court's order and the governing statute create a presumption that a new rule governs pending proceedings unless its application would be unjust or impracticable. 2015 US Order 0017; 28 U.S.C. § 2074(a). Here, because the amendment is in some respects more lenient as to the sanctions that can be imposed for violation of the preservation obligation, there is no inequity in applying it.[5] Cf. Ultra-Temp Corp. v. Advanced Vacuum Systems, Inc., 194 F.R.D. 378, 381 (D.

---

[5] If relief available under the amended rule were less adequate than that available under the prior rule in remedying any prejudice to the defendants, a different outcome might be warranted. However, as discussed below, the amended rule can provide sufficient relief in the current circumstances.

Mass. 2000) (holding that, while conduct of litigant should be judged by Rule 11 in effect when conduct occurred, sanctions should be governed by amended rule, which made them discretionary rather than mandatory). Therefore, I will consider the defendants' motion in light of current Rule 37(e).

B. <u>Loss of Information</u>

The issue then arises whether the conduct alleged by the defendants is sanctionable under Rule 37(e). According to the plaintiffs,

> In the instant case, there has been no destruction or loss of any evidence, and there certainly has not been both (i) loss of evidence AND (ii) "such evidence cannot be restored or replaced" as required by Rule 37. Rather, the issue is the appearance of an email address on Plaintiffs' documents that is different from an email address as it allegedly appears on Defendants' documents. Defendants' [sic] do not allege that Plaintiffs' [sic] have destroyed emails in their entirety. In fact, the Defendants' [sic] do not even allege that the actual content of the handful of emails at issue is material to any claims or defenses in this lawsuit. Put simply, though there may be an evidentiary dispute as to which email address versions are more accurate, Defendants' [sic] have not been deprived of any information or potential evidence. Since there is no missing or destroyed evidence, sanctions cannot be properly imposed under Rule 37 or under a theory of spoliation [sic].

(Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Sanctions ("Pl. Memo.") at 10-11). In effect, the plaintiffs argue that even if they are the "gang that couldn't spoliate straight," <u>see</u> <u>Victor Stanley, Inc. v. Creative Pipe, Inc.</u>, 269

F.R.D. 497, 501 (D. Md. 2010), they cannot be sanctioned because their misdeeds were discovered and the information recovered.  They are incorrect.

First, it cannot be said that the information lost has been "restored or replaced."  Referring to this language in Rule 37(e), the Advisory Committee noted that "[b]ecause electronically stored information often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere."  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  Thus, relief would not be available under the amended rule where, for example, emails are lost when one custodian deletes them from his mailbox but remain available in the records of another custodian.  But, as the plaintiffs themselves suggest, the fact that there are near-duplicate emails showing different addresses casts doubt on the authenticity of both.  (Tr. at 35-36 ("[E]ven to this day there are different accounts on what happened or what e-mail is more authentic.")).  In other words, as long as the plaintiffs are permitted to rely on the emails to argue that the defendants had notice of their use of the SLAMXHYPE mark as of the date of those emails, a different version of the same email is not an adequate substitute.  Prior to the amendment of Rule 37(e), the court in <u>Victor Stanley</u> reached a similar conclusion, finding that even though the information destroyed there was "cumulative to

some extent," the loss still caused substantive prejudice to the innocent plaintiff because "Plaintiff's case against Defendants is weaker when it cannot present the overwhelming quantity of evidence it otherwise would have to support its case."  269 F.R.D. at 533.

If, notwithstanding this reasoning, Rule 37(e) were construed not to apply to the facts here, I could nevertheless exercise inherent authority to remedy spoliation under the circumstances presented.  According to the Advisory Committee, the new rule "forecloses reliance on inherent authority or state law to determine when certain measures should be used."  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  This means, for instance, that a court could not rely on one of those other sources of authority to dismiss a case as a sanction for merely negligent destruction of evidence, as would have been the case under Residential Funding, 306 F.3d at 108.

However, "[i]t has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'"  Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (quoting United States v. Hudson, 11 U.S. (7 Cranch) 32, 34 (1812)) (second alteration in original).  "These powers are

'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" <u>Id.</u> (quoting <u>Link v. Wabash Railway Co.</u>, 370 U.S. 626, 630-31 (1962)).   One such inherent power is the authority to impose sanctions for the bad faith spoliation of evidence.

> The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct "which abuses the judicial process." The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth . . . . The courts must protect the integrity of the judicial process because, "[a]s soon as the process falters . . . the people are then justified in abandoning support for the system."

<u>Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC</u>, 685 F. Supp. 2d 456, 465-66 (S.D.N.Y. 2010) (alterations in original) (quoting <u>Silvestri v. General Motors Corp.</u>, 271 F.3d 583, 590 (4th Cir. 2001)), <u>abrogated in part on other grounds by Chin v. Port Authority of New York & New Jersey</u>, 685 F.3d 135 (2d Cir. 2012); <u>see also Ceglia v. Zuckerberg</u>, 600 F. App'x 34, 36 (2d Cir. 2015) ("A court has 'inherent power' to fashion an appropriate sanction for conduct which abuses the judicial process.'" (quoting <u>Chambers</u>, 501 U.S. at 44-45)), <u>petition for cert. filed</u>, No. 15-586 (U.S. Nov. 5, 2015).

Where exercise of inherent power is necessary to remedy abuse of the judicial process, it matters not whether there might be another source of authority that could address the same issue.  In Chambers, the Supreme Court rejected the argument by the party opposing the sanctions motion that provisions of the Federal Rules of Civil Procedure foreclosed resort to inherent power.  401 U.S. at 42-43.  It stated that "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct."  Id. at 49.; see also Haeger v. Goodyear Tire & Rubber Co., 793 F.3d 1122, 1131-32 (9th Cir. 2015) ("This inherent power is not limited by overlapping statutes or rules.).  At the same time, the Court held that it is "plainly the case" that a court may resort to its inherent power "where the conduct at issue is not covered by one of the other sanctioning provisions." Chambers, 401 U.S. at 50.

Thus, sanctions would be available under the court's inherent authority even if Rule 37(e) did not apply.  A party's falsification of evidence and attempted destruction of authentic, competing information threatens the integrity of judicial proceedings even if the authentic evidence is not successfully deleted.  See United States v. Shaffer Equipment Co., 11 F.3d 450, 462 (4th Cir. 1993) ("[W]hen a party . . . abuses the process at a level that is utterly inconsistent with the orderly administration

of justice or undermines the integrity of the process, the court has the inherent power to dismiss the action"); <u>accord</u> <u>Kalwasinski v. Ryan</u>, No. 96-CV-6475, 2007 WL 2743434, at *2 (W.D.N.Y. Sept. 17, 2007).

    C. <u>Standard of Proof</u>

    Courts appear to be divided with respect to the appropriate standard of proof to apply to a claim of spoliation.  Some utilize the preponderance of the evidence standard applicable in most contexts in civil litigation.  <u>See, e.g.</u>, <u>Krause v. Nevada Mutual Insurance Co.</u>, No. 2:12-cv-342, 2014 WL 496936, at *7 (D. Nev. Feb. 6, 2014); <u>In re Napster, Inc. Copyright Litigation</u>, 462 F. Supp. 2d 1060, 1072 (N.D. Cal. 2006).  Others require that the more demanding "clear and convincing" standard be met.  <u>See, e.g.</u>, <u>Aptix Corp. v. Quickturn Design Systems, Inc.</u>, 269 F.3d 1369, 1374 (Fed. Cir. 2001); <u>Shepherd v. American Broadcasting Cos.</u>, 62 F.3d 1469, 1476-77 (D.C. Cir. 1995).  Still others have found it unnecessary to define the evidentiary requirement in circumstances where the higher standard was met in any event.  <u>See, e.g.</u>, <u>Haeger</u>, 793 F.3d at 1131; <u>Lewis v. Ryan</u>, 261 F.R.D. 513, 519 n.2 (S.D. Cal. 2009).

    There are three perspectives from which to approach the analysis.  First, where the court relies on its inherent power to impose sanctions, as opposed to authority grounded in statute or rule, it is more likely that and convincing evidence will be

required. See Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 78 (2d Cir. 2000). Second, a high standard is appropriate where the sanction sought is case-terminating or otherwise punitive in nature. See Shepherd, 62 F.3d at 1476-77. Third, the appropriate standard of proof depends in part on the specific issue to be decided. For example, clear and convincing evidence of bad faith may be appropriate, see id. at 1477, while prejudice is better judged by the preponderance standard, see Residential Funding, 306 F.3d at 109; Kronisch v. United States, 150 F.3d 112, 128 (2d Cir. 1998) ("[To] hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction."), overruled on other grounds, Rotella v. Wood, 528 U.S. 549 (2000); Rimkus Consulting Group, Inc. v. Cammarata, 688 F. Supp. 2d 598, 616 (S.D. Tex. 2010) (holding "[t]he burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its destruction." (quoting Heng Chan v. Triple 8 Palace, Inc., No. 03 Civ. 6048, 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005))).

Because, in this case, the defendants seek terminating sanctions and the plaintiffs' state of mind is at issue, it is

appropriate to utilize the clear and convincing standard with
respect to disputed issues concerning the plaintiffs' conduct.
Other issues, such as the relevance of the emails, are effectively
undisputed.

D. <u>Spoliation</u>

The evidence supports the defendants' allegation that the
plaintiffs intentionally altered the emails at issue.   The
defendants' expert, Mr. Kunkel, is well-qualified.   He has been
performing forensic investigations in his current position for four
years, prior to which performed similar work for another  private
investigation firm for two years.   Before that, he provided
forensic computer analysis and engaged in cyber counterintelligence
work for the United States Air Force.  (Curriculum Vitae of Michael
Kunkel, attached as Exh. A to Kunkel Decl.).

Mr. Kunkel's conclusions are well-supported.  He examined the
emails in native form using a forensic tool.   (Tr. at 3).   He
discovered that they had resided on the plaintiffs' computer system
in both a deleted and an active form, with the active version,
which was produced by the plaintiffs in discovery, reflecting an
email address seemingly supporting their legal position, while the
deleted emails contained an address that was not helpful to the
plaintiffs. (Tr. at 3-6; Kunkel Decl., ¶¶ 7-11).  According to Mr.
Kunkel, the process of deletion and replacement was not accidental

22

(Tr. at 5); rather, it was "the result of intentional human action, and not of an automatic or inadvertent computer process" (Kunkel Decl., ¶ 13).

By contrast, the testimony proffered by the plaintiffs is less than compelling.  Their expert, Mr. Hilbert, did not analyze the emails in their native form; indeed, there is no indication that he is qualified to do so.  (Tr. at 22-23).  Instead, he testified to the possibility that alteration of an email address could be caused either by a setting in the server through which the email is routed (Tr. at 23-24) or by the migration of email from one system to another (Tr. at 24-26).  Neither theory is persuasive.  The first fails because, as Mr. Kunkel testified, if the address were set as a default by the computer, only one version of the email would remain on the system, not a deleted version and an active one. (Tr. at 14-15).  The second hypothesis is flawed as well.  Mr. Hilbert acknowledged that it would be "uncommon" for email addresses to change as a consequence of a migration process.  (Tr. at 28).  Moreover, he knew nothing about the migrations that the plaintiffs actually implemented.  (Tr. at 28).  Essentially, he offered no more than speculation.

The declarations submitted by the plaintiffs' officers and the testimony of Mr. Martinez add little.  Each generally denies knowledge of any spoliation, but only Mr. Martinez has any

23

technical expertise.   Yet, when he oversaw the migration of the plaintiffs' email system, he was apparently unaware of any supposed risk of alteration to email addresses.   (Tr. at 17-18).   He could not explain how the domain suffix on an email address might change except by deletion and replacement of the email.   (Tr. at 19-20). And he was not even sure that a computer could be set to convert an email address from one suffix to another.   (Tr. at 21).

Finally, the plaintiffs failed to present evidence that might have bolstered their alternative theories.   For example, they have not explained why a default setting for an email address would change the address not only when the individual is the sender, but also when he is the addressee or is copied on the email.   (See Kunkel Decl. Exhs. F & L (alteration in addressee's email address), Exhs. G & M (sender), H & N (sender), I & O (addressee), (J & P (sender), K & Q (party copied)).[6]   Similarly, the plaintiffs have offered no evidence that the automatic alteration processes they hypothesize caused changes to any other emails besides those relevant to the claims in this litigation.   Presumably, any such process would not have been selective: it would have affected the

_____

[6] Indeed, the plaintiffs themselves argued only that there is a "fundamental, technical phenomenon" by which "the Gmail email service modifies an outgoing email _sender_ address to a _default_ or _authenticated_ address associated with the email user." (Letter of Nicholas R. Lewis dated Oct. 26, 2015, at 1-2) (first emphasis added).

emails of multiple employees, regardless of subject matter.

There is clear and convincing evidence, then, that the plaintiffs manipulated the emails here in order to gain an advantage in the litigation. To be sure, that evidence is largely circumstantial. But circumstantial evidence may be accorded equal weight with direct evidence, see Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1184 (2d Cir. 1992), and standing alone may be sufficient to support even a determination that requires proof beyond a reasonable doubt, see United States v. Newman, 773 F.3d 438, 451 (2d Cir. 2014), cert. denied, __ U.S. __, 136 S. Ct. 242 (2015); United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008).

These findings provide the basis for relief under Rule 37(e). First, each of the threshold requirements of the rule is met. The emails are plainly "electronically stored information." There is no dispute that the plaintiffs were obligated to preserve them in connection with this litigation. As discussed above, information was "lost" and cannot adequately be "restored or replaced." And the plaintiffs' manipulation of the email addresses is not consistent with taking "reasonable steps" to preserve the evidence.

Next, remedies are available under subsection (e)(1) of Rule 37. The defendants have been prejudiced by the fabrication of the substitute emails because, as discussed above, the existence of multiple versions of the same document at the very least obfuscates

25

the record.   This was demonstrated by the presentation of the
doctored email to the president of Black Lineage at his deposition.
Moreover, the defendants have been put to the burden and expense of
ferreting out the malfeasance and seeking relief from the Court.

The prerequisite for assessing sanctions under subsection
(e)(2) has been met as well.   The plaintiffs "acted with the intent
to deprive another party of the information's use in the
litigation." Fed. R. Civ. P. 37(e)(2).   As Mr. Kunkel found, the
plaintiffs' conduct was intentional.   And, given the benefit they
would derive in this case from showing that the defendants were on
notice of the plaintiffs' use of the SLAMXHYPE mark and the absence
of any other credible explanation for altering the email addresses,
it is more than reasonable to infer that the intention was to
manipulate the digital information specifically for purposes of
this litigation.

If the plaintiffs were correct that Rule 37(e) is inapplicable
here, relief would nonetheless be warranted under the Court's
inherent power.   A "particularized showing of bad faith" is
necessary to justify exercising that power.   United States v.
International Brotherhood of Teamsters, 948 F.2d 1338, 1345 (1991);
accord Braun ex rel. Advanced Battery Technologies, Inc. v. Zhiguo
Fu, No. 11 Civ. 4383, 2015 WL 4389893, at *17 (S.D.N.Y. July 10,
2015); Novick v. AXA Network, LLC, No. 07 Civ. 7767, 2014 WL

26

5364100, at *5 (S.D.N.Y. Oct. 22, 2014).  Spoliation designed to deprive an adversary of the use of evidence in litigation qualifies as bad faith conduct.

E. Relief

In light of the findings here, dismissal of the action or imposition of an adverse inference are available sanctions under either Rule 37(e) or the court's inherent authority.  See Fed. R. Civ. P. 37(e)(2); West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) (Under inherent authority, "[d]ismissal is appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party.").  However, such drastic sanctions are not mandatory.  In amending Rule 37(e), the Advisory Committee noted:

> Finding an intent to deprive another party of the information's use in the litigation does not require a court to adopt the measures listed in subdivision (e)(2). The remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when the information was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss.

Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Similarly, under inherent authority, severe sanctions "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." West, 167 F.3d at 779 (quoting John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,

845 F.2d 1172, 1176 (2d Cir. 1988)).  "[T]he applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." Id.

> The sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore "the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."

Id. (quoting Kronisch, 150 F.3d at 126).

Here, these considerations dictate a two-fold remedy.  First, the plaintiffs shall be precluded from relying upon their version of the emails at issue to demonstrate notice to the defendants of use of the SLAMXHYPE mark.  This order of preclusion adequately protects the defendants against any legal prejudice arising from the plaintiffs' conduct.  An order of dismissal, an adverse inference, or a broader preclusion order would unnecessarily hamper the plaintiffs in advancing what might, in fact, be legitimate claims.  For example, the plaintiffs may be able to prove the defendants' knowledge of the plaintiffs' prior use of the SLAMXHYPE mark through evidence separate and independent from the emails.

Second, the plaintiffs shall bear the costs, including reasonable attorneys' fees, incurred by the defendants in establishing the plaintiffs' misconduct and in securing relief. This remedy ameliorates the economic prejudice imposed on the

defendants and also serves as a deterrent to future spoliation.[7]

The relief outlined here satisfies the dictates of Rule 37(e)(2) and of principles of inherent authority not to impose unnecessarily drastic sanctions. Furthermore, it is also consistent with Rule 37(e)(1), as it is no more severe than is necessary to cure the prejudice to the defendants.

<u>Conclusion</u>

For the reasons set forth above, the defendants' motion for sanctions (Docket no. 69) is granted to the extent that the plaintiffs (1) are precluded from relying on the subject emails, and (2) shall pay the attorneys' fees and costs incurred by the defendants in establishing the spoliation and obtaining relief; the motion is otherwise denied. Within fourteen days of the date of this order, the defendants shall submit an affidavit detailing the attorneys' fees and costs for which they seek an award. The plaintiffs shall submit any objections to the defendants' request within seven days thereafter.

---

[7] The obligation to pay attorneys' fees and costs is placed upon the plaintiffs, as there is no evidence of culpability on the part of their prior counsel. To the extent that the plaintiffs believe that their former attorneys bear all or some responsibility, they shall so indicate at the time that they submit any objections to the defendants' requested fees and costs, and further proceedings will be held to apportion responsibility.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          January 12, 2016

Copies transmitted this date:

Gregg Donnenfeld, Esq.
501 Tenth Ave., Floor 7
New York, NY 10018

Nicholas R. Lewis, Esq.
3873 N.E. 22nd Way
Lighthouse Point, FL 33064

Edward Flanders, Esq.
Matthew D. Stockwell, Esq.
Pillsbury Winthrop Shaw Pittman, LLP
1540 Broadway
New York, NY 10036

Richard H. Zaitlen, Esq.
Jennifer Seigle, Esq.
Pillsbury Winthrop Shaw Pittman, LLP
725 S. Figueroa St., Suite 2800
Los Angeles, CA 99017-5406